JUDGE STANTON

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PHILIPPE MAESTRACCI,

                  *Plaintiff,*

v.

*SEATED MAN WITH A CANE, 1918*, A
PAINTING BY AMEDEO MODIGLIANI,

                  *Defendant in rem,*

HELLY NAHMAD GALLERY, INC.

                  *Defendant.*
------------------------------------------------------------X

11 CIV 7710

Index No._____

**VERIFIED COMPLAINT**

Plaintiff Philippe Jacques Maestracci ("Maestracci") through his undersigned counsel, Dunnington, Bartholow & Miller LLP by Complaint, alleges as follows:

**NATURE OF ACTION**

1. This is an action for declaration of title, conversion and replevin of a painting by Amedeo Modigliani, a renowned Italian Jewish artist who worked predominantly in France, titled "*Seated Man with a Cane*, 1918" ("the Painting" or "Defendant *in rem*") currently located in the possession of Helly Nahmad Gallery, Inc. ("Helly Nahmad") in New York City, brought on by Philippe Maestracci, the sole heir of Oscar Stettiner ("Stettiner"). Stettiner operated a commercial art gallery in Paris called Stettiner et Cie ("Stettiner Gallery").

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C §1332(a). There is complete diversity of citizenship between Plaintiff and Defendant. Plaintiff is a citizen of

1

France. Defendant is a citizen of New York County. The matter in controversy exceeds $75,000, exclusive of interest and costs.

3. Additionally, because Defendant *in rem* is a chattel located in this judicial district over which there is a "case or controversy" requiring declaratory relief, this Court is authorized by 28 U.S.C. §§ 1651 and 1655 to exercise *in rem* and *quasi-in-rem* jurisdiction, declare title and order the Painting's return.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and (c) as Defendant is a corporation located in New York County and the Painting that is the subject matter of this dispute is located in this judicial district.

5. This Court is authorized to grant the relief requested pursuant to 28 U.S.C. §§ 2201(a) and 2202.

## THE PARTIES

6. Plaintiff Maestracci is a resident and a citizen of France who was born in Perigueux, Dordogne, France in 1944. He is the only surviving grandson and sole heir of Oscar Stettiner.

7. Upon information and belief, Defendant Helly Nahmad Gallery, Inc. is an art gallery organized and existing under the laws of New York with a principal place of business at 975 Madison Avenue, New York, New York 10075.

## BACKGROUND

8. From early 1933, National Socialists ("Nazis"), a German political party, occupied the majority of Europe under the totalitarian rule of Adolf Hitler. The Nazis came to occupy much of Europe until 1945. During this period, Hitler, a failed artist himself,

2

*PM*·

commenced the most notorious art looting period in the history of the world. Among numerous other assaults on human rights, the Nazis feverishly pursued an agenda of destroying, confiscating or selling abroad art the Nazis considered "Jewish," "degenerate" or "modern."

9. Separately, the Nazis embarked on a systematic campaign to despoil all Jews in the "Reich" of their property. This spoliation occurred through boycotts, "Aryanizations," confiscatory tax and foreign exchange laws applicable only to Jews, sham transactions and outright confiscations. As the German Reich expanded during the period of Nazi aggression, these anti-Semitic confiscatory policies were enforced in Nazi-occupied territories.

10. Following World War II, the U.S. State Department relieved U.S. courts of any restraint on jurisdiction to unwind the official acts of the Nazi regime.

11. In the late 1930's, the Nazi regime began to advance towards France. In May of 1940, the German Army, under Nazi control, defeated French forces in the Battle of France. By June of 1940, an armistice was signed that designated the north and west of France as occupied Nazi territory. The rest of the country was allowed to exist as a free zone, without Nazi occupation.

12. In occupied France, the Nazis implemented anti-Semitic confiscatory policies and laws.

13. Oscar Stettiner was a Jewish art dealer who resided and worked in Paris in the 1930's. He owned an art gallery and had a personal art collection.

14. Stettiner's art collection contained a number of works, including the Painting.

15. In 1930, Stettiner loaned the Painting to the Venice Biennale, a world-famous art exhibition that occurs every two years.

3

16. The Painting was listed as number 35 and as having been loaned by Stettiner in the Venice Biennale catalog. A true image of the Painting is annexed hereto as Exhibit "A".

17. On or about November 20, 1939, with the threat of a Nazi invasion looming, Stettiner fled Paris, leaving his art collection, including the Painting.

18. Stettiner fled to his home in La Force, Dordogne, France, which was located in the unoccupied zone of France. He remained in La Force until his death on February 25, 1948. He was survived by his wife, Renee Suzanna Magenties Stettiner, two children, son Jacques Henri Stettiner and daughter Maud Stettiner. Jacques died without issue. Maud's son and only issue, Plaintiff Philippe Jacques Maestracci is the sole heir of Stettiner.

19. The Nazis adopted a practice and policy of despoiling Jewish families of property located in the Occupied Zone by forced sales.

20. Pursuant to this practice and policy, the Nazis would appointe a "Temporary Administrator" ("Commissaire Gerant") to marshal and sell Jewish property and to turn the proceeds over to the Nazi Reich.

21. Pursuant to this practice and policy, Marcel Philippon was appointed Temporary Administrator in 1941 to sell Stettiner's property. In 1943 and 1944, Philippon held four public auctions of Stettiner's property.

22. On July 3, 1944, Philippon sold the Painting.

23. The July 3, 1944 sale took place without Stettiner's consent.

24. In 1946, following the end of World War II, forced sales of Jewish property during the Nazi regime were declared null and void.

4

pm.

25. Under New York law, the July 3, 1944 sale was void since it occurred without the owner's consent in violation of international law and New York's law and public policy not to recognize forced sales under the Nazi regime.

26. Following World War II, the U.S. courts have exercised jurisdiction to undo acts of Nazi spoliation under the "Bernstein exception" to the act of state doctrine. *See Bernstein v. Nederlandsche-Amerikaansche Stoomvaart-Maatshappij*, 210 F.3d 375 (2d Cir. 1954).

27. After the Stettiner Gallery closed due to the Nazi invasion in France, Marcel Philippon was appointed the Temporary Administrator of the gallery in 1941. In 1943 and 1944, Philippon held four public auctions of the gallery.

28. In 1946, Stettiner commenced proceedings to recover the Painting from Philippon and the person who purchased the Painting at the July 3, 1944 sale, but was unsuccessful in finding the Painting.

29. From 1946 to the present, the Stettiner heirs have made reasonable and diligent efforts to recover Stettiner's art collection.

30. Upon information and belief, prior to 2008, the Painting was exhibited and sold with an inaccurate provenance that attributed its prior ownership to someone other than Stettiner and with a claim that it was number 16 in the 1930 Venice Biennale. Number 16 was a work that did not belong to Stettiner.

31. Since the Painting was described as "Portrait of a Man" in numerous records and Modigliani painted numerous portraits of men, the misidentification made the Painting nearly impossible to trace as long as the Painting's provenance was misidentified.

32. In 2008, Sotheby's published the Painting, bearing the title *Homme Assis (Appuyé sure une canne)* [translated herein as Seated Man (leaning on a cane)] as being consigned for sale

by Helly Nahmad for its November 3, 2008 Impressionist & Modern Art Evening Sale. For the first time, the Painting was listed as being number 35 in the 1930 Venice Biennale, and thus revealing and confirming for the first time the Painting's connection to Stettiner. Attached hereto as Exhibit "B" is a true copy of an excerpt of Sotheby's November 3, 2008 sale catalog.

33. Upon information and belief, the Painting failed to sell.

34. On February 28, 2011 Plaintiff wrote to Defendant, through counsel, and demanded return of the Painting.

35. On March 29, 2011, Plaintiff again wrote to Defendant, through counsel, and sought a response.

36. Due to Defendant's lack of response, Plaintiff deems that Defendant has refused to return the Painting as of August 2011.

37. Upon information and belief, the fair market value of the Painting exceeds three million ($3,000,000) U.S. dollars.

### FIRST CLAIM

#### (Declaratory Judgment – Title)

38. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

39. At the time of the commencement of this action and at all times hereinafter mentioned, Plaintiff was and is the owner and entitled to the immediate possession of the Painting.

40. This case involves an actual controversy over title of the Painting.

41. Plaintiff is the heir of Oscar Stettiner.

42. Pursuant to 28 U.S.C. §§2201-2202 and 28 U.S.C. §§ 1651 & 1655 of the Federal Rules of Civil Procedure, Plaintiff is entitled to be declared the owner of the Painting.

43.     Plaintiff requests such relief against Helly Nahmad Gallery, Inc. and against any other persons who may assert claims in the Painting.

## SECOND CLAIM

### (Conversion - Damages and attorneys' fees for wrongful withholding and interfering with possession of the Paintings)

44.     Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

45.     Plaintiff demanded the return of the Painting.

46.     Helly Nahmad Gallery, Inc. ignored these requests and thus, as of August 2011, Plaintiff deemed that Defendant refused to return the Painting.

47.     Helly Nahmad Gallery's wrongful retention caused Plaintiff to expend monies and attorney's fees in pursing the Painting. By refusing to return the Painting to the true owners, Helly Nahmad Gallery wrongfully interfered with Plaintiff's rightful possession and caused damages in the amount of the fair market value of the Painting, together with attorneys fees and the expenses of this action.

## THIRD CLAIM

### (Replevin)

48.     Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

49.     At the time of the commencement of this action and at all times hereinafter mentioned, Plaintiff was and is the owner and entitled to the immediate possession of the Painting.

50.     Helly Nahmad Gallery, Inc. is in possession of the Painting or, upon information and belief, has the Painting under its control.

51. Helly Nahmad Gallery's detention of the Painting is wrongful because the Painting rightfully belongs to Plaintiff.

52. Prior to commencement of this action, Plaintiff duly demanded possession of the Painting, but Helly Nahmad Gallery has refused and still refuses to deliver the Painting to Plaintiff.

53. By reason of such wrongful detention of the paintings by Helly Nahmad Gallery, Plaintiff prays for an order directing that the Painting be returned to Plaintiff, or in the alternative, awarding damages in an amount to be determined by the court, together with costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

1. Declare that Plaintiff is the rightful owner of a painting by Amedeo Modigliani known as a *"Seated Man with a Cane, 1918"* and order the Helly Nahmad Gallery to deliver such property to the Plaintiffs;

2. In the alternative, direct Defendant to pay as damages the fair market value of the Painting together with the reasonable costs and attorney's fees associated with recovery of the Painting;

3. Award Plaintiff fees and costs pursuant to Fed. R. Civ. P. 54(d)17;

4. Grant such other and further relief as the Court deems just and proper.

8

*DWL*

Dated: October 27, 2011
    New York, New York

               Respectfully submitted,

               **DUNNINGTON BARTHOLOW & MILLER LLP**

By: _____
      Raymond J. Dowd
      1359 Broadway, Suite 600
      New York, New York 10018
      Tel: (212) 682-8811
      Fax: (212) 661-7769
      *Attorneys for Plaintiff*
      *Philippe Maestracci*

9

*PM.*

I declare, subject to the penalties of perjury under the laws of the United States that the foregoing is true and correct, except where alleged upon information and belief, and with respect to those allegations, I believe them to be true.

Dated: **at La Force**, France

October **27**, 2011

*[signature]*

Philippe Jacques Maestracci

# Exhibit A



# Exhibit B



# IMPRESSIONIST & MODERN ART EVENING SALE

## NEW YORK   MONDAY 3 NOVEMBER 2008   7:00 PM

EXHIBITION
Wednesday 29 October   10:00 am - 5:00 pm
Thursday 30 October   10:00 am - 5:00 pm
Friday 31 October   10:00 am - 5:00 pm
Saturday 1 November   10:00 am - 5:00 pm
Sunday 2 November   1:00 pm - 5:00 pm
Monday 3 November   10:00 am - 12:00 pm

TRAVELLING EXHIBITION
OF HIGHLIGHTS
London   3-7 October
Moscow   16-19 October

BIDDING

Bidding privileges for the evening Sale 8485 Impressionist & Modern Art Evening Sale on 3 November 2008 will only be granted to purchasers who have pre-registered with our Accounting Department at least three business days prior to the sale. Please contact Jean Wu at +1 212 606 7281 if you wish to arrange for a paddle.

1334 YORK AVENUE NEW YORK 10021

# 26 Amedeo Modigliani 1884-1920

## HOMME ASSIS (APPUYÉ SUR UNE CANNE)

Signed *Modigliani* (upper right)
Oil on canvas
49⅝ by 29½ in.
126 by 75 cm
Painted in 1918.

$18,000,000-25,000,000

Provenance
(possibly) Roger Dutilleul, Paris
(possibly) Stettiner, Paris (by 1930)
J. Livengood, Paris (acquired *circa* 1940-45 from an anonymous Paris sale)
Private Collection (by descent from the above and sold: Christie's, London, June 25, 1996, lot 15)
Acquired at the above sale by the present owner

Exhibited
Venice, XVII Biennale Internazionale d'Arte, *Mostra Individuale di Amedeo Modigliani*, 1930, no. 35 (titled *Ritratto d'uomo*)
Lugano, Museo d'Arte Moderna, *Amedeo Modigliani*, 1999, illustrated in the catalogue
New York, The Jewish Museum; Ottawa, The Art Gallery of Ontario & Washington, D.C., The Phillips Collection, *Modigliani Beyond the Myth*, 2004-05, illustrated in color in the catalogue pl. 58
New York, Helly Nahmad Gallery, *Amedeo Modigliani: A Bohemian Myth*, 2005, illustrated in color in the catalogue
London, Royal Academy of Arts, *Modigliani and His Models*, 2006, no. 30, illustrated in color in the catalogue

Literature
Ambrogio Ceroni, *Amedeo Modigliani*, Milan, 1958, no. 113, illustrated (with the measurements 100 by 65 cm)
Ambrogio Ceroni & Leone Piccioni, *I Dipinti di Modigliani*, Milan, 1970, no. 252, illustrated p. 101 (with the measurements 100 by 65 cm)
Joseph Lanthemann, *Modigliani, 1884-1920, Catalogue raisonné, Sa vie, son oeuvre complet, son art*, Barcelona, 1970, no. 118, illustrated p. 189
Osvaldo Patani, *Amedeo Modigliani*, Milan, 1991, no. 265, illustrated p. 268 (with the measurements 100 by 65 cm)
Christian Parisot, *Modigliani Catalogue Raisonné*, Livorno, 1991, no. 31/1918, illustrated p. 215 (with the measurements 100 by 65 cm)





Fig. 1



Fig. 2



Fig. 3

This dashing gentleman is one of the anonymous figures whom Modigliani painted at the end of the war while living in Nice. Like the anonymous children or working-class models that feature in Modigliani's pictures from this period, the sitter was probably hired to pose for the artist during these months in 1918 (fig. 2 & 3). Earlier that March, Modigliani had moved his studio to Nice in anticipation of the German advance towards Paris. He knew few people in the south of France, and because commissions were scarce, he was obliged to choose models from all walks of life. One cannot help to be struck, however, by this figure's striking resemblance to Modigliani's former dealer Paul Guillaume, who wore a similar suit, tie and fedora in his portrait of 1916 (fig. 1). Joseph Lanthemann points out the sitter's likeness to Guillaume in his 1970 publication, and posits that this work may be a portrait of the man himself (fig. 4). But the present painting, more so than the earlier Guillaume painting, takes greater liberties in abstracting the features of the model. His face appears as geometric and stylized as an African tribal mask (fig. 6), and his body mimics the curvature of the cane against which he is posed. Without any obligations to flatter or fulfill the particular expectations of his patrons and friends, Modigliani exercised a newfound stylistic bravura in these portraits that he would apply to his later works, including his portraits of *Monsieur Baranowski* and *Roger Dutilleul*.

Another artistic influence on this picture is the work of Cézanne. Modigliani famously admired Cézanne's highly geometric approach to pictorial perspective and incorporated the Post-Impressionist's techniques and earth-toned color palette into his art. Tamar Garb has written about Modigliani's receptivity to the work of Cézanne, and her analysis can be readily applied to the present work: "Never seamless, his figures appear to have been assembled on the picture plane, stitched and pieced together in paint, their parts demarcated and defined in line. Asymmetry and curious disjunctions, most markedly expressed in the frequently mismatched eyes, while positing a subject that is divided and riven from within – literally split apart – are nevertheless subsumed in a fabricated, precariously balanced pictorial whole. The integrated subject of Modigliani's portraits links him to a world before Cubism, most notably that of his mentor Paul Cézanne, with his famous spatial disjunctions and decomposition of the world of visual sensation, his breaking apart of the structure of things so that their very physical makeup could be conveyed in an accumulation of separate color patches, each visible on the paint surface" (T. Garb, "Making and Masking, Modigliani and the Problematic of Portraiture," *Modigliani, Beyond the Myth* (ex. cat.), *op. cit.*, p. 46).

"More than anything else, Modigliani was a portrait painter" the historian Werner Schmalenbach wrote in his well-known essay on the artist's portraiture, in which he considered Modigliani to be at the forefront of this genre in the 20th century. Schmalenbach explained that the artist's approach was one of cool distance and keen insight, a combination which enabled him to render the "likeness" of his sitter: "They are unequivocally portraits and, contrary to all the artistic precepts of the age, they possess a documentary value. Even a portrait such as that of Max Jacob, for all its formalization and stylization, is still a likeness – incontestably so, since it is actually based on a photograph. At the same time, however the sitter's individuality is reduced to the extent that the stylization creates the effect of a mask. This brings African masks to mind, but here there is nothing alien, mysterious or demonic about the mask; it masks nothing. On the contrary, the sitter

Fig. 1, Amedeo Modigliani, *Portrait de Paul Guillaume (Novo Pilota)*, 1915, oil on cardboard, Musée de l'Orangerie, Paris, Walter-Guillaume Collection

Fig. 2, Amedeo Modigliani, *Le fils du concierge*, 1918, oil on canvas, sold: Sotheby's, New York, November 7, 2006, lot 38, for $31,096,000

Fig. 3, Amedeo Modigliani, *Le Petit paysan*, circa 1918, oil on canvas, Tate Gallery, London

Fig. 4, Paul Guillaume in his apartment, circa 1918.



Fig. 5



Fig. 6

has sacrificed to the form some of his individuality, his emotions, his affective life, just as the paint, for his part, keeps emotion well away from that form. He looks at this fellow man with great coolness. The warmth of the painting lies solely in its colour. This combination of cool detachment with painterly warmth lends the painting – like many other works by the artist – its own specific "temperature" (W. Schmalenbach, "The Portraits," *Modigliani, L'ange au visage gravé* (ex. cat.), Musée du Luxembourg, Paris, 2002-03, pp. 42-43).

It is believed that the first owner of this picture was Roger Dutilleul, who began his relationship with Modigliani the same year the painting was completed. As one of the first significant collectors of twentieth century avant-garde art, Dutilleul played an essential role in supporting the creative development of some of the most daring artists in Paris, including Léger, Picasso, Braque, Miró and, perhaps most importantly, Modigliani. His perspicacity and discriminating taste were renowned during the early years of the 1900s, and his eye for recognizing artistic talent rivaled that of the greatest collectors of his day. Discussing Dutilleul's historic importance during these nascent years of the modern art movement, Daniel-Henry Kahnweiler remarked, "a gallery, painters and the owner of the gallery could survive on very few collectors, three or four; true, these were loyal friends. First and foremost in France, Roger Dutilleul, who was from the very outset passionate about collecting" (quoted in F. Berthier and M. Restellini, "The Great Collectors of Modigliani in 1920," *ibid.*, p. 410).

Fig. 5. Installation view of the Modigliani room (Sala 31) at the XVII Esposizione Internazionale d'Arte di Venezia, 1930, showing the present work.

